COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| CHARLES LEVI MORROW, | § | |
| | | No. 08-16-00040-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 394th District Court |
| THE STATE OF TEXAS, | § | |
| | | of Brewster County, Texas |
| Appellee. | § | |
| | | (TC# 4410) |
| | § | |

### **O P I N I O N**

Charles Levi Morrow was convicted of murder and sentenced to a term of fifty-five years' imprisonment. In six issues, he contends: (1) the trial court erred when it qualified the jury without having a transcript of the proceedings taken by a court reporter; (2) the trial court erred in denying his motion to suppress his recorded interview because he unequivocally invoked his right to counsel at the beginning of that interview; (3) the trial court erred in failing to include an instruction on the lesser-included offense of criminally negligent homicide; (4) the evidence was legally insufficient for the jury to convict him of murder; (5) the trial court erred in failing to include an instruction on sudden passion during the punishment phase of the trial; and (6) he

1

received constitutionally ineffective assistance of counsel.   We affirm.

## BACKGROUND

This case arises from a murder that took place after a night of heavy drinking and drug use. The day before Halloween in 2014, sometime after 4:00 p.m., Appellant Charles Morrow arrived at the American Legion lodge in Terlingua, Texas.   There, he began drinking with an acquaintance he had met at the lodge on a prior occasion, Rhonda Bloom.   They were joined later that evening by Keith McWilliams and the victim, Walter Sands.   The four drank and reveled until the lodge closed, at which time they adjourned to the parking lot and continued drinking there until around 4:30 a.m.   They were also smoking marijuana.   Sands and McWilliams claimed they had been out camping before coming to the lodge and had no place to stay, so Bloom offered to let the men come back to her home and sleep there.   Bloom also invited Appellant to stay the night.   The four then drove to Bloom's home, but instead of sleeping they all continued drinking beer and whiskey in Bloom's garage.   At some point in the early morning, Bloom went into the kitchen to make coffee and breakfast.   While making breakfast, Bloom heard yelling and what sounded to her like fighting coming from the garage.   She ran to the garage and found McWilliams and Appellant attacking Sands.   Appellant was beating Sands with a two-by-four and McWilliams was striking him with a pistol.   Bloom did not intervene, but later estimated the fight lasted for about ten minutes.

The altercation stopped when Sands disentangled himself from the other men and fell backward onto a compost pallet.   Sands screamed, "You stabbed me, Keith, you stabbed me! Why did you stab me?"   He had been stabbed in the sternum and was bleeding profusely from multiple cuts on his head and body.   Bloom helped him outside and demanded the other men explain why

2

they had been fighting. Appellant and McWilliams claimed Sands had started the altercation. Bloom realized that Sands was seriously injured and urged the others to take him to the hospital. Due to the way the vehicles had been parked, however, their vehicles were blocked in by McWilliams's truck, and McWilliams claimed he could not find his keys. The three carried Sands to the bathroom where Bloom had an emergency kit containing bandages and a stapler. Bloom used the stapler to staple shut some of Sands's head wounds. Sands then vomited on himself. With the help of Appellant and McWilliams, Bloom undressed Sands and placed him in the bathtub. Appellant then left the room. While Bloom was cleaning the vomit and blood off Sands, McWilliams pistol whipped him again. Bloom took Sands to one of the bedrooms and retrieved fresh clothes and a blanket for him. She then took McWilliams to the garage and forced him to sit down on a spare cot.

Bloom returned to the house, intending to retrieve her shoes and somehow get Sands off the property. When she returned to the garage, she found McWilliams and Appellant beating Sands. The men were pummeling Sands with their fists. At some point, Appellant grabbed the two-by-four and began beating him with it, while McWilliams resumed pistol whipping him. Sands was knocked to the floor, and while on the floor began convulsing. McWilliams walked over to Sands, raised his pistol, and shot him in the head. Appellant then struck Sands in the head multiple times with the two-by-four. Appellant turned to the others and stated he needed to cut off Sands's finger tips and remove his teeth because Sands was a United States Marine and his corpse could be identified if found. After saying this, Appellant and McWilliams began stomping and kicking Sands's body.

McWilliams and Appellant eventually stopped and began discussing what to do with the

3

body. With Bloom's help, they began cleaning up the blood using a mix of water, bleach, and detergent. Appellant and McWilliams took Sands's body and put it in the back of the vehicle Sands had driven to the party, a U-haul truck. The men initially decided they would dump the corpse in a well on McWilliams's property. Although Bloom did not want to go with them, McWilliams stated, "You are in it just as much as we are; you are going with us." Bloom accompanied them, and the three drove out to a ravine located in the Terlingua Ranch. With Bloom serving as lookout, Appellant and McWilliams threw Sands's body into the ravine and threw rocks and dirt on top of him to conceal the body. They laughed as they did so, shouting "trick or treat," and "happy Halloween." After covering the body to their satisfaction, the three left the area. They lost their way multiples times on the drive out of the ranch and even managed to get a flat tire before finally returning to Bloom's home.

Once back at Bloom's, the three disposed of Sands's bloody clothing and other evidence that had been left at the house by burning it in an incinerator on the property. They then attempted to repair the flat tire with a tire sealant one of them had. While repairing the tire, McWilliams asked Bloom and Appellant to look for his knife because he had lost it during the fight and did not find it during their initial cleanup of the property. Bloom and Appellant looked for over an hour but were unable to locate it. The trio then drove the vehicles to McWilliams's home, which was located on a nearby property, and left Sands's vehicle there.

After a few days had passed, Sands's family became concerned because they could not get in touch with him. They called the local sheriff's office and reported him missing. A few weeks passed without progress. Sands's sister eventually called the local Texas ranger, Jeffrey Vajdos, and told him that her brother was not answering calls, had missed family events, and had last been

4

seen in Terlingua. Through his investigation, Vajdos's discovered that Sands had last been seen at the lodge with McWilliams. Vajdos went to McWilliams's home to investigate, and there discovered Sands's vehicle still parked in the driveway. He spoke with McWilliams and asked him whether he knew where Sands was. McWilliams claimed he had not seen Sands for several weeks. Vajdos asked why Sands's truck was in his driveway but McWilliams did not have an answer for this. After continued questioning, McWilliams broke down and confessed to killing Sands and implicated Bloom and Appellant in the murder. He then led Vajdos to Sands's body in the ravine. All three were arrested and charged with murder.

Appellant filed a pretrial motion to suppress a video interview he gave to Ranger Vajdos in which he admitted to killing Sands, claiming he had invoked his right to counsel but that the request was ignored by Vajdos. The trial court denied the motion and the case proceeded to trial. After deliberations, a jury found Appellant guilty of murder and sentenced him to fifty-five years' imprisonment and assessed a fine of $10,000. This appeal followed.

## DISCUSSION

### Jury Qualification

In his first Issue, Appellant contends the trial court erred when it qualified the jury without having a transcript of the proceedings taken by a court reporter. Appellant claims this denied him the opportunity to challenge the trial court's disqualification of venirepersons on appeal because there was no record from which to determine whether any challengeable conduct had occurred. The State counters that jury qualification is not considered part of trial proceedings and thus does not require a transcript. Alternatively, the State contends Appellant was present during voir dire and participated by using for-cause challenges during the proceedings, thus rendering any error

5

harmless.

It is the duty of an appellate court to first ensure a claim was properly preserved in the trial court before addressing the merits of an issue. *Wilson v. State*, 311 S.W.3d 452, 473 (Tex.Crim.App. 2010). Error preservation is a systemic requirement on appeal, and if an issue has not been preserved the court of appeals should not address the merits of that issue. *Ford v. State*, 305 S.W.3d 530, 532 (Tex.Crim.App. 2009). To preserve a claim that the court reporter has failed to record a certain proceeding, the Appellant must object to the failure before the trial court. *Williams v. State*, 937 S.W.2d 479, 487 (Tex.Crim.App. 1996)(*citing Walthall v. State*, 594 S.W.2d 74, 81 (Tex.Crim.App. 1980)).

*Analysis*

Here, Appellant complains that the trial court's failure to transcribe the jury-qualification proceedings was error because it denied him the opportunity to determine whether the court improperly dismissed venirepersons *sua sponte* without finding they were "absolutely disqualified" under Article 35.19 of the Texas Code of Criminal Procedure. Appellant does not allege that he objected to this error before the trial court. Although there is no record of the qualification proceedings, voir dire was transcribed and there is no indication that Appellant ever objected to the alleged failure during any part of that proceeding. And before seating the jury, the trial court asked whether either the State or the defense had any objections to the selected jury, and both the State and Appellant stated, "No, Your Honor." Because Appellant did not preserve this issue for our review, the issue is waived. *Williams*, 937 S.W.2d at 487. Issue One is overruled.

**Invocation of the Right to Counsel**

6

In his second issue, Appellant contends the trial court erred in denying his motion to suppress his recorded interview with Ranger Vajdos because he unequivocally requested an attorney at the start of the interview. Because Vajdos continued questioning him after this request, he contends the trial court erred in admitting the video.

### *Standard of Review*

We review claims of alleged *Miranda* violations and the admission of statements made during custodial interrogation under a bifurcated standard of review. *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex.Crim.App. 2012). We afford nearly complete deference to the trial court on questions of historical fact and credibility and review de novo questions of law and mixed questions of law and fact that do not turn on credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).

### *Applicable Law*

When a suspect invokes his Fifth Amendment right to counsel, law enforcement must immediately cease interrogation until counsel has been provided or the suspect reinitiates a dialogue. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). But merely mentioning the word "attorney" or "lawyer," without more, does not automatically invoke the right to counsel. *Etheridge v. State*, 903 S.W.2d 1, 18 (Tex.Crim.App. 1994). A suspect must clearly indicate a desire to speak to an attorney or have an attorney present during questioning. *Lucas v. State*, 791 S.W.2d 35, 45 (Tex.Crim.App. 1989). An ambiguous or equivocal reference to an attorney does not require cessation of questioning if a reasonable officer would have only understood that the suspect *might* be invoking the right to counsel. *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex.Crim.App. 1995). For example, the phrase, "maybe I should talk to a lawyer," has been held

7

to be too equivocal to constitute an invocation of the right to counsel. *Id*., at 352. While it may be "good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney," officers are not required to ask clarifying questions. *Davis v. U.S.*, 512 U.S. 452, 461 (1994).

*Analysis*

Here, Appellant filed a motion to suppress a video interview he gave in which he implicated himself in the murder, claiming the video itself shows he unambiguously invoked his right to counsel. As the video begins, the following exchange occurs between Appellant and Ranger Vajdos:

[APPELLANT]: Can I like have some sort of lawyer present or something?

[VAJDOS]: We're gonna . . . you have that option.

[APPELLANT]: Okay.

[VAJDOS]: Okay?

[APPELLANT]: I mean, I don't wanna be . . .

[VADJOS]: You tell us what you want to do.

[APPELLANT]: I don't want to be noncompliant, I just wanna, you know, cover my ass, whatnot.

[VADJOS]: We'll turn [the camera] off and we can walk right out of here. You've been read your rights, you've been magistrated and stuff?

[APPELLANT]: Yeah.

[VADJOS]: Like I said when you walked in, there's some admin stuff we have to get to, we have to read you your rights, we have to explain to you why you're here. So if you want a lawyer, dude, we'll get up and walk right out now and we'll deal with it that way. You have that right. You're the one who said you

8

wanted to cooperate.

[APPELLANT]:    Yeah, yeah I want to cooperate. Yeah. Let's do it.

[VADJOS]:       You sure?

[APPELLANT]:    Yeah.

[VADJOS]:       Okay.

Vadjos then read Appellant his *Miranda* warnings.  After reading the warnings, Vadjos again reiterated that if Appellant wanted an attorney, that was his right and they would terminate the interview and leave the room immediately if he requested one.  Appellant replied, "[Y]eah, okay, I'll just talk with you guys."  He then proceeded to implicate himself in the murder.

As noted, an invocation of the right to counsel must be unequivocal.  *Lucas*, 791 S.W.2d at 45.  Appellant's question, "Can I have some sort of lawyer present or something?" like the phrase, "maybe I should talk to a lawyer," is not an unequivocal invocation of that right.  *Dinkins*, 894 S.W.2d at 352.  The ambiguity of Appellant's statement alone was sufficient for the trial court to deny his motion to suppress.  *See Guzman*, 955 S.W.2d 89.  Moreover, even though he was not required to do so, Ranger Vadjos asked clarifying questions and stated on three separate occasions that if Appellant wanted an attorney, he would immediately terminate the interview and get him an attorney.  In response, Appellant stated he wanted to cooperate and wanted to speak with Vadjos.  Because Appellant did not unequivocally invoke his right to counsel, the trial court did not err in denying his motion to suppress his recorded statements.  Issue Two is overruled.

### Instruction on Lesser-Included Offense

In his third issue, Appellant contends the trial court erred in not including an instruction to the jury on the lesser-included offense of criminally negligent homicide.  He contends the

9

evidence warranted that instruction, but that the trial court neglected to include it. He did not object to this alleged error in the trial court.

### Standard of Review

We review claims of jury-charge error by first determining whether an error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If we determine error exists, we then analyze that error for harm. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003). The degree of harm required for reversal depends on whether the defendant objected to the error at trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(op. on reh'g). If a defendant fails to object to the lack of a jury instruction, or fails to present a proposed jury instruction, any potential error in the charge is reviewed only for "egregious harm." *Oursbourn v. State*, 259 S.W.3d 159, 174 (Tex.Crim.App. 2008). Egregious harm deprives a defendant of a fair and impartial trial and occurs where the error "affects the very basis of the case, deprives the defendant of a valuable right, or vitally affect[s] a defensive theory." [Internal quotations omitted]. *Trejo v. State*, 313 S.W.3d 870, 871 (Tex.App.—Houston [14th Dist.] 2010, pet. ref'd)(*quoting Olivas v. State*, 202 S.W.3d 137, 144 (Tex.Crim.App. 2006)). In reviewing for egregious harm, we consider: (1) the charge itself; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Id*.

### Applicable Law

We determine whether an appellant was entitled to a charge on a lesser-included offense by considering all of the evidence introduced at trial, whether produced by the State or the defendant. *Penry v. State*, 903 S.W.2d 715, 755 (Tex.Crim.App. 1995)(*citing Goodwin v. State*,

799 S.W.2d 719, 740 (Tex.Crim.App. 1990)).  We utilize a two-pronged test in our review. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex.Crim.App. 2012).  First, we determine whether the proof necessary to establish the charged offense also included the lesser offense.  *Id*., (*citing Hall v. State*, 225 S.W.3d 524, 535–36 (Tex.Crim.App. 2007)).  If the offense is in fact a lesser-included offense, we move to the second step of the test and consider "whether there is some evidence that would permit a rational jury to find that, if the appellant is guilty, he is guilty only of the lesser offense.  *Id*., at 383.

A defendant commits the offense of criminally negligent homicide where:  (1) the defendant's conduct caused the death of an individual; (2) the defendant should have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) the defendant's failure to perceive the risk was a gross deviation from the standard of care an ordinary person would have exercised under similar circumstances.  *Montgomery v. State*, 369 S.W.3d 188, 192–93 (Tex.Crim.App. 2012).

*Analysis*

Here, Appellant contends that when he hit Sands in the head with the two-by-four, he "failed to perceive that his conduct was a gross deviation from what an ordinary person would do in similar circumstances," and he should have been aware that his actions posed a substantial and unjustifiable risk of death.  The State agrees criminally negligent homicide is a lesser-included offense of murder.  The State contends, however, that there is no evidence in the record that would allow a rational jury to find Appellant guilty of only criminally negligent homicide.

In the recorded interview, Appellant stated that after McWilliams shot Sands in the back of the head, they began burning clothes and evidence.  Sands, however, continued to wheeze,

11

"like snoring before it hits the loud part." Appellant stated he knew Sands was dying, so he went into the garage and hit Sands in the head four times with the two-by-for, "you know, just to end it." He stated they then finished cleaning everything up, wrapped Sands in plastic, placed him in the back of the U-Haul, and then continued drinking whiskey and smoking marijuana before going to sleep. Bloom's testimony was that Appellant bludgeoned Sands in the head shortly after McWilliam's had shot him. She stated Appellant immediately turned to the others and claimed he needed to cut off Sands's finger tips and remove his teeth to prevent identification.

While, Morrow's actions may be properly characterized as a gross deviation from what an ordinary person would do under similar circumstances, that does not entitle him to an instruction on criminally negligent homicide. The evidence shows Appellant acted with the specific intent to cause Sands's death and with knowledge that his actions would cause Sands's death. He has pointed to no evidence in the record from which a rational jury could find he failed to perceive the risk that his actions would cause Sands's death, and we have found none. Accordingly, Appellant was not entitled to an instruction on criminally negligent homicide. *Cavazos*, 382 S.W.3d at 383. Issue Three is overruled.

## Legal Sufficiency of the Evidence

In his fourth issue, Appellant contends the evidence was legally insufficient to convict him of murder, basing this contention entirely on reference to his assertion in the preceding issue that the evidence showed he was only guilty of criminally negligent homicide.

### *Standard of Review*

In a legal sufficiency challenge, we view the evidence in the light most favorable to the verdict and will uphold the conviction if there is sufficient evidence to justify a jury to rationally

12

find the appellant guilty beyond a reasonable doubt on all essential elements of the offense. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). The evidence is measured against the hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). A hypothetically correct jury charge lists all elements of the offense, is consistent with the indictment, and does not unnecessarily increase the prosecution's burden of proof. *Id*.

### *Applicable Law*

A person commits the offense of murder if he: (1) intentionally or knowingly causes the death of an individual; or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX.PENAL CODE ANN. § 19.02(b).

### *Analysis*

Under the hypothetically correct jury charge, the jury would need to find beyond a reasonable doubt that: (1) Appellant; (2) intentionally or knowingly; (3) caused the death of Sands. As discussed above, Appellant admitted in his confession that he bludgeoned Sands in the head with a two-by-four. He stated that his reason for doing this was that he knew Sands was dying from the gunshot wound—a fact he determined from Sands's labored breathing—and he wanted to end his suffering. Bloom's testimony was that Appellant struck Sands in the head multiple times after McWilliams had shot him, and that after striking him in the head he immediately told the others they needed to remove Sands's teeth and finger tips to prevent identification of his body. From this evidence, a jury could have rationally found Appellant guilty of murdering Sands beyond a reasonable doubt on all essential elements of the offense. *Salinas*, 163 S.W.3d at 737. Issue Four is overruled.

## Punishment-Phase Instruction

In his fifth issue, Appellant contends the trial court erred in failing to include a sudden passion or adequate cause instruction in its charge to the jury during the punishment phase.

### *Standard of Review*

As noted above, we review claims of jury-charge error by first determining whether an error exists in the charge. *Ngo*, 175 S.W.3d at 743. If error exists, we then analyze that error for harm. *Middleton*, 125 S.W.3d at 453. If a defendant failed to object to the lack of a jury instruction, any potential error in the charge is reviewed only for "egregious harm." *Oursbourn*, 259 S.W.3d at 174.

### *Applicable Law*

Section 19.02(d) of the Texas Penal Code provides that at the punishment phase of trial, a defendant may raise the issue as to whether he caused the victim's death under the immediate influence of sudden passion arising from adequate cause. TEX.PENAL CODE ANN. § 19.02(d). To be entitled to an instruction on sudden passion, there must be some evidence, however weak, contested, or incredible, that could support a rational jury finding the defendant acted under the immediate influence of sudden passion arising from an adequate cause. *Benavides v. State*, 992 S.W.2d 511, 526 (Tex.App.—Houston [1st Dist.] 1999, pet. ref'd); *Davila v. State*, 952 S.W.2d 872, 877 (Tex.App.—Corpus Christi 1997, pet. ref'd). The Penal Code defines "sudden passion" and "adequate cause" as follows:

(1) 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

(2) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed

14

which passion arises at the time of the offense and is not solely the result of former provocation.

TEX.PENAL CODE ANN. § 19.02(a).

Sudden passion is a mitigating circumstance, and if proven by a preponderance of the evidence, reduces the offense of murder to a second-degree felony. TEX.PENAL CODE ANN. § 19.02(d). It is not sufficient for the evidence to merely show the defendant was angry; there must be evidence the defendant was acting out of sudden passion. *Davila*, 952 S.W.2d at 877 (*citing Owens v. State*, 786 S.W.2d 805, 808 (Tex.App.—Fort Worth 1990, pet. ref'd)).

### *Analysis*

Here, Appellant contends he was in a state of sudden passion because he was afraid of McWilliams. Having just seen McWilliams shoot Sands in the head, he was terrified he could be next and therefore was incapable of cool reflection before he smashed in Sands's head with the two-by-four. It would appear, as near as we can determine, that Appellant is arguing he was so caught up in being afraid of McWilliams that he could not reflect on his actions. In support of this assertion, he points to Bloom's testimony where she stated, "I was terrified, sir. I just went along with it. I though they were going to kill me. I thought I was next." He contends he shared this state of mind and therefore was in a state of sudden passion when he killed Sands.

Even assuming his terror of McWilliams sufficed as adequate cause rendering him incapable of cool reflection, the evidence must also show he was in a state of sudden passion arising directly out of provocation by Sands that occurred at the time of the offense, and not from some prior provocation. TEX.PENAL CODE ANN. § 19.02(a). There is nothing in the record that shows why the second fight between Sands on the one hand and Appellant and McWilliams on the other began, much less that the victim provoked the Appellant in some way during this second

15

altercation. The only evidence regarding why Appellant chose to kill Sands comes from Appellant himself in his recorded interview when he stated he killed Sands to stop his suffering. He did not claim a provocation caused him to kill Sands. Further, Bloom's testimony was that Appellant and McWilliams were already beating Sands when she entered the garage. Sands was knocked to the floor and while on the floor began convulsing. While he was convulsing on the floor, McWilliams shot him in the head. Appellant, having seen this, then bludgeoned him in the head with the two-by-four. Bloom stated Appellant immediately turned to the others and stated he needed to cut off Sands's finger tips and remove his teeth to prevent identification. This testimony does not reflect that Appellant "was in the throes of sudden passion," but that he was reflective and aware of his actions. *Davila*, 952 S.W.2d at 877. Because there was no evidence that Appellant was acting out of sudden passion, there was no error in the charge. Issue Five is overruled.

**Ineffective Assistance of Counsel**

In his sixth and final issue, Appellant contends he received ineffective assistance of counsel. He claims his counsel's performance fell below an objective standard of reasonableness in three ways: (1) he failed to object that the trial court did not order a transcript made of the jury qualification procedures; (2) he failed to object that the trial court did not include an instruction on the lesser included offense of criminally negligent homicide; and (3) he failed to request an instruction on sudden passion during the punishment phase. Appellant asserts he was prejudiced by this allegedly deficient performance in that, but for counsel's errors, he likely would have received a not-guilty verdict, or alternatively would have received a much shorter sentence.

***Standard of Review***

16

A criminal defendant is entitled to be represented by effective, competent counsel under the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). But this right does not entitle a defendant to errorless or perfect representation as judged by the benefits of hindsight; rather, it entitles him or her to reasonably effective assistance of counsel. *Cueva v. State*, 339 S.W.3d 839, 858 (Tex.App.—Corpus Christi 2011, pet. ref'd) (quoting *Rylander v. State*, 101 S.W.3d 107, 109-10 (Tex.Crim.App. 2003)).

We review claims for ineffective assistance of counsel under the well-established standard set by *Strickland*. We determine whether the appellant has shown by a preponderance of the evidence that his counsel's performance fell below an objective standard of reasonableness. *Cavitt v. State*, 507 S.W.3d 235, 248 (Tex.App.—Houston [1st Dist.] 2015, pet. ref'd)(citing *Strickland*, 466 U.S. at 687-88). That is, the appellant must prove that there was no plausible professional reason for a specific act or omission by counsel. *Bone v. State*, 77 S.W.3d 828, 836 (Tex.Crim.App. 2002). If counsel was deficient, we determine whether there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Id.*; *Adekeye v. State*, 437 S.W.3d 62, 73 (Tex.App.—Houston [14th Dist.] 2014, pet. ref'd). The two prongs of the *Stickland* test do not need to be analyzed in any particular order, and an appellant's failure to satisfy either prong defeats a claim of ineffective assistance of counsel. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex.Crim.App. 2001)(citing *Strickland*, 466 U.S. at 697). Absent evidence of counsel's strategic motivations for his actions at trial, we indulge a strong presumption that counsel rendered adequate assistance and that his actions were a result of a sound trial strategy. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999). Moreover, on direct appeal the record is usually insufficiently developed to allow an appellate court "to fairly

evaluate the merits of such a serious allegation." [Internal quotations omitted]. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex.Crim.App. 2011)(*quoting Bone v. State*, 77 S.W.3d 828, 833 (Tex.Crim.App. 2002)). As the Court of Criminal Appeals has stated, claims of ineffective assistance of counsel "are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Id*.

*Analysis*

Appellant's first allegation of ineffective assistance is based on his trial counsel's failure to object to the trial court qualifying the jury outside the presence of the court reporter. This was harmful, he contends, because it denied him the opportunity to determine whether the trial court improperly dismissed prospective jurors *sua sponte* without first determining they were absolutely disqualified. A trial court should not excuse a juror on its own motion unless that juror is "absolutely disqualified" as that term is defined in Article 35.19 of the Texas Code of Criminal Procedure. *Pearce v. State*, 513 S.W.2d 539, 541 (Tex.Crim.App. 1974). Even if Appellant could show counsel's performance was constitutionally deficient for failing to object to not having a court reporter transcribe a routine jury-qualification proceeding, which Appellant attended, he has not demonstrated how he was harmed by this failure. Appellant has made no showing that any juror harbored bias or prejudice against him and did not object to the jury as seated. Accordingly, having failed to show harm, Appellant has failed to satisfy the second prong of the *Strickland* test on his attorney's alleged failure to object to the absence of a court reporter. *Bone*, 77 S.W.3d at 836.

Appellant next contends that he received ineffective assistance of counsel because his attorney failed to object to the lack of instructions on criminally negligent homicide and sudden

18

passion. Because, as we have already held, Appellant was neither entitled to an instruction on criminally negligent homicide nor an instruction on sudden passion, he cannot show there was no plausible professional reason for counsel's failure to object in either instance. *Bone*, 77 S.W.3d at 836. Accordingly, Issue Six is overruled.

## CONCLUSION

Having overruled Issues One through Six, the judgment of the trial court is affirmed.

April 5, 2019

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)